```
                                              USDC SDNY
                                              DOCUMENT
                                              ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                  DOC #:
SOUTHERN DISTRICT OF NEW YORK                 DATE FILED: 8/7/09
```

------------------------------------X
                                    :    05 Civ. 4261 (LAP)(THK)
In re M/V RICKMERS GENOA            :    05 Civ. 6226 (LAP)(THK)
LITIGATION,                         :    05 Civ. 8841 (LAP)(THK)
                                    :    05 Civ. 9472 (LAP)(THK)
THIS DOCUMENT RELATES TO:           :
ALL ACTIONS                         :    Memorandum and Order
                                    :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

On March 31, 2009, the Court issued an Opinion [dkt. no. 125 (4261 action)] (the "Opinion") granting in part and denying in part summary judgment for Defendant ESM Group Inc. ("ESM Group"). Third-Party Plaintiffs Rickmers-Linie GmbH & KG, Rickmers Genoa SchiffahrtsGes mbH & Cie. KG, and Genoa Navigation Co. Ltd. (the "Rickmers Interests"), as well as ESM Group have separately moved for reconsideration pursuant to Local Civil Rule 6.3 [dkt. nos. 126 and 128 (4261 action)]. For the reasons set forth herein, ESM Group's Motion for Reconsideration is GRANTED, for the sole purpose of conducting a more complete choice of law analysis, and the Rickmers Interests' Motion for Reconsideration is DENIED. As explained herein, the conclusions of the Opinion stand as previously so ordered.

I. Motion for Reconsideration Standard

Local Rule 6.3 permits a party to move for reconsideration of a court order determining a motion within ten days of entry of the determination of the original motion. See Local Civil Rule 6.3.  To succeed on the motion, the party seeking reconsideration must present controlling decisions or facts that the court originally overlooked. See Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).  In order to be properly considered upon reconsideration, any controlling decisions or factual matters presented must have been put before the court in the underlying motion. Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000).  A party may not relitigate an already decided issue on a motion for reconsideration. Henderson v. Metropolitan Bank & Trust Co., 502 F. Supp. 2d 372, 376 (S.D.N.Y. 2007).

II. ESM Group's Motion for Reconsideration

ESM Group's Motion for Reconsideration was timely.  ESM Group contends that it did not agree to the wholesale application of federal maritime law to the claims asserted in these actions and that the Court's choice of law analysis, which rested on the understanding that all parties agreed to apply

federal maritime common law, was flawed.[1] (See Opinion at 13-14, n.9.)  ESM Group's contention that the Court overlooked some of ESM Group's arguments in its supplemental letters and briefs for the application of New York law appears to be well founded. Accordingly, reconsideration of the choice of law issue is appropriate at this time.

The parties have had ample opportunity--in the summary judgment briefing, the oral arguments, and on the motions for reconsideration--to articulate their positions with respect to what law or laws should apply to the claims and theories in these actions.[2]  Accordingly, upon reconsideration I conclude that federal maritime law (statutory and common) indeed applies to all claims and theories asserted in these actions for the reasons set forth in the following choice of law analysis.

---

[1] Federal maritime law includes federal maritime statutes enacted by Congress and the federal maritime common law developed by federal courts hearing cases in their maritime jurisdiction.  It should be noted that some courts refer to the federal maritime common law as the "general maritime law" or "general admiralty law." See, e.g., Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875 (1997) ("[The] general maritime law [is] an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, drawn from both state and federal sources." (internal quotation marks omitted).).

[2] To the extent that ESM Group reasserts discovery objections or objects that it has not had a full and fair opportunity to brief the choice of law question, the objections are denied as unfounded. See also note 4, infra.

3

The operative complaints in these actions invoke this Court's maritime subject matter jurisdiction. No party contests such invocation, and it is proper. (See Opinion at 11.) While the source of a court's subject matter jurisdiction may not always be dispositive on the question of what substantive law to apply,[3] federal maritime law is usually applied when a federal court's maritime jurisdiction is invoked. See Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 23 (2004) (noting that the exercise of a court's maritime jurisdiction is a prerequisite to the application of federal maritime common law); East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864-65 (1986) (noting generally that "[w]ith admiralty jurisdiction comes the application of substantive admiralty law"); Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959)). In determining whether to apply federal maritime law in an action, the paramount inquiry for the court is to determine whether the facts concern traditional maritime activity. See Kirby, 543 U.S. at 22-23 (determining whether the factual situation presented was "salty" in nature); Kossick v. United Fruit Co., 365 U.S. 731, 742 (1961) (same). More specifically, maritime courts have developed tests for determining whether a

---

[3] See Carey v. Bahama Cruise Lines, 864 F.2d 201, 206 (1st Cir. 1988).

4

particular claim qualifies as a maritime claim and thus warrants the application of federal maritime law. For tort claims, "the situs of the tort must be maritime (the location test) and the tort must bear a significant relationship to traditional maritime activity (the nexus test)." Carey v. Bahama Cruise Lines, 864 F.2d 201, 206 n.4 (1st Cir. 1988); Sorensen v. City of New York, 202 F.2d 857, 1086-87 (2d Cir. 1993). For breach of contract claims, the determination depends on whether the relevant contract (usually a bill of lading) qualifies as a maritime contract and involves inherently local matters. Kirby, 543 U.S. at 22-23. Statutory claims under COGSA, of course, deserve application of federal maritime statutory law. Id. at 29; Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc., 291 F.3d 145, 166-67 (2d Cir. 2002).

  The facts involved in these actions and the claims asserted here make this an easy case for application of federal maritime law. The tort claims asserted against the various defendants involve alleged conduct or omissions that occurred on the high seas or in relation to maritime activity. The relevant bills of lading at issue in these actions are for the carriage of goods by sea and do not involve inherently local matters. The COGSA claims asserted, by definition, invoke a federal maritime statute. As such, these claims deserve the application of

federal maritime law. I do not understand any party seriously to object to this determination.

However, at least with respect to the corporate control theories of liability asserted against ESM Group,[4] ESM Group contends that state law should apply because states have a greater interest in policing corporate relations. ESM Group suggests that cases such as Marsh v. Rosenbloom, 499 F.3d 165, 181 (2d Cir. 2007), and United States v. Bestfoods, 524 U.S. 51 (1998), stand for the general rule that federal law should not be applied to corporate control theories. And, as a factual matter, ESM Group contends that its corporate relationship with ESM Tianjin Co. Ltd. ("ESMT") was not maritime in nature but rather concerned regular commodity sales and purchase agreements.

I find these arguments unavailing. Federal maritime common law is appropriately applied to corporate control liability theories in maritime actions in order to promote uniformity throughout the maritime law. See Kirby, 543 U.S. 14, 395-97 (2004) ("Article III's grant of admiralty jurisdiction must have

---

[4] While the operative complaints in these actions did not initially enumerate corporate control theories of liability until leave to amend was granted in the Opinion (see Opinion at 44-45), all parties were aware that these theories had become viable during the course of summary judgment briefing and arguments. All parties had an opportunity to proffer a choice of law analysis as to these theories.

6

referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states." (internal quotation marks omitted)); Pink Goose (Cayman) Ltd. v. Sunway Traders LLC, 08 Civ. 2351, 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008) ("[A]lter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty."). Particularly in light of the unique corporate arrangements that exist in the maritime industry and the need for uniformity of maritime laws, the federal maritime common law has adopted rules governing corporate liability, irrespective of whether corporate entities expected, ex ante, that their corporate relationship would eventually be scrutinized in the context of a maritime action. See Williamson v. Recovery Ltd. P'ship, 542 F.3d 43, 53 (2d Cir. 2008); Dow Chem. Pac. Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 339-43 (2d Cir. 1986); Kirno Hill, 618 F.2d at 985; Status Int'l S.A. v. M & D Mar. Ltd., 994 F. Supp. 182, 186 (S.D.N.Y. 1998).

Additionally, ESM Group's proposed rule that state laws should be applied to corporate control theories in maritime

7

actions runs counter to the overriding presumption that federal maritime law (statutory or common) displaces otherwise applicable state law. See American Dredging Co. v. Miller, 510 U.S. 443, 984-85 (1994) (discussing federal preemption doctrines applicable to state laws inconsistent with the general maritime law); Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1917) ("[N]o [state] legislation is valid if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations."); Aurora Maritime Co., Ltd. v. Abdullah Mohamed Fahem & Co., 890 F. Supp. 322 (S.D.N.Y. 1995) (discussing the Jensen and Miller displacement rules).[5] While it is true that the federal maritime common law draws upon state corporate control liability principles, those principles tend to be displaced once integrated into the federal maritime common law. See generally 1 Thomas J Schoenbaum, Electronic Pocket Part, Admiralty and Maritime Law § 4-2 (4th Ed. 2009).  In fact,

---

[5] Of course, in the absence of a controlling maritime law rule, it may be appropriate to apply state law. See, e.g., Petition of Alva S. Co., 405 F.2d 962, 969-70 (2d Cir. 1969) (applying New York law to a question of governmental tort liability in the absence of an applicable maritime law rule).  Furthermore, the Jensen rationale has developed over time, and courts have tended to apply its holding with caution. See Sorensen v. City of New York, 202 F.2d 857, 859-60 (2d Cir. 1953).

"[t]he federal courts [sitting in admiralty] prefer to borrow the general common law rather than the law of any particular state because this promotes uniformity in the general maritime law." Id.

As evident from the line of cases discussing federal maritime common law corporate control doctrines, an established body of common law exists and is applicable here. (See Opinion at 37-43.) While the parties may debate the contours of the federal maritime common law, it applies to the claims asserted in these actions. Accordingly, ESM Group's motion for Reconsideration is granted to the extent a proper choice of law analysis was warranted. However, upon reconsideration, the Court adheres to the Opinion's conclusion that federal maritime law applies to the claims and theories asserted in these actions.

III. The Rickmers Interests' Motion for Reconsideration

The Rickmers Interests' Motion for Reconsideration was timely. The Rickmers Interests' contend that the Court improperly evaluated and dismissed their contract claims asserted against ESM Group. (See Opinion at 30-35.) The Rickmers Interests essentially reaffirm their position that ESM Group is bound by obligations contained in the Pudong Bill of Lading and ask this Court to consider new facts, not previously

9

raised in the summary judgment motion briefing.[6]  Of course, such matters are improperly raised on a motion for reconsideration.  Nevertheless, the Rickmers Interests' new arguments appear, at first blush, to have merit and thus deserve attention.  Accordingly, this Order further explains why the Rickmers Interests' contract claims asserted against ESM Group must be dismissed.

By way of background, on or about January 25, 2005, ESM Group ordered 900 metric tons of the chemical known as SS-89 from its wholly-owned Chinese subsidiary, ESMT.  On or around March 3, 2005, ESMT arranged for a Non-Vessel Owning Common Carrier ("NVOCC"), Pudong Trans U.S.A., Inc. ("Pudong"), to transport a shipment of the SS-89 from the ESMT plant in China

---

[6] The Rickmers Interests' do not reassert that ESM Group is bound by the RICKMERS Bill of Lading.  Rather, the Rickmers Interests' primary contentions now are: (1) that ESM Group's mere status as a holder/ consignee of the Pudong Bill of Lading makes it liable for the obligations contained therein, and (2) ESM Group became liable for the obligations contained in the Pudong Bill of Lading when ESM Group sued on it.
   Additionally, the Rickmers Interests only now address the issue of whether they actually have standing to assert rights under the Pudong Bill of Lading.  The Rickmers Interests now argue that they were third party beneficiaries of the Pudong Bill of Lading and should be entitled to enforce it against ESM Group. See Rickmers Interests' Motion for Reconsideration or Opinion and Order for Summary Judgment at 7.  Irrespective of whether this argument is now properly raised, it is moot in light of the dismissal of the Rickmers Interests' contract claims against ESM Group. (See Opinion at 30-35; infra.)  Similarly, the Court need not consider ESM Group's argument that the Rickmers Interests' cannot occupy a better position than Pudong, which has defaulted in this action.

10

to the Chinese port of Xingang, where ESMT had arranged for the shipment to be transported by sea to the United States aboard the M.V. RICKMERS GENOA (the "RICKMERS"). When Pudong picked up the shipment, Pudong issued ESMT a bill of lading (the "Pudong Bill of Lading") identifying ESMT as the "shipper/exporter" and identifying "To Order of Shipper" as the "consignee." Once the shipment was stowed aboard the RICKMERS and marked accordingly, Pudong notified ESMT. Eventually, after the RICKMERS collided with another vessel and the goods were destroyed, ESMT sent the Pudong Bill of Lading to ESM Group in the United States.

The Rickmers Interests now contend that Stolt Tank Containers, Inc. v. Evergreen Marine Corporation, 962 F.2d 276 (2d Cir. 1992), compels the conclusion that ESM Group was bound by the Pudong Bill of Lading. The Court does not read that decision to compel such a conclusion. In Stolt, the Court of Appeals held that a bill of lading's $500 per package liability limitation provision was enforceable against a non-party shipper to the bill of lading because the non-party shipper had constructive notice that such a liability limitation would apply. 962 F.2d at 279-80. The Court of Appeals's rationale depended largely on the interrelationship of the Carriage of Goods by Sea Act ("COGSA") and maritime bills of lading. Id. The Court of Appeals found that all shippers, even non-party shippers to bills of lading--that is, shippers who do not

11

directly contract with carriers but rather rely on common carriers or NVOCC's to accomplish intermediate delivery of their goods to ocean carriers--are, or should be, aware of COGSA § 4(5)'s liability limitation rule. Id.

> COGSA § 4(5) sets forth the rule that,
>
> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

COGSA § 4(5) (emphasis added).[7] The Court of Appeals held that regardless of whether or not a particular shipper is technically a party to any given bill of lading, all shippers that participate in the transmission of a shipment have constructive knowledge of COGSA § 4(5) and are thus bound by provisions evidencing § 4(5)'s limited liability rule contained in bills of lading issued by other shippers in the line of transmission. Stolt, 962 F.2d at 279. In other words, the Court of Appeals did not hesitate to extend bill of lading limited liability provisions to non-party shippers because such provisions merely reflect the liability regime prescribed by COGSA.

---

[7] 46 U.S.C. § 30701 note.

Stolt's rationale does not apply here because the contract provision the Rickmers Interests attempt to enforce against ESM Group would extend liability to cargo purchasers--far beyond what COGSA prescribes.  The provision the Rickmers Interests seek to enforce is set forth in section 6 of the Pudong Bill of Lading:

> (1) The Merchant shall comply with the rules which are mandatory according to the National Law or by reason of International Convention, relating to the carriage of Goods of a dangerous nature and shall in any case inform the Carrier in writing of the exact nature of the danger before Goods of a dangerous nature are taken in charge by the Carrier and indicate to him, if need be, the precautions to be taken.
> (2) If the Merchant fails to provide such information and the Carrier is unaware of the dangerous nature of the Goods and the necessary precautions to be taken and if, at the time, they are deemed a hazard to life of property, they may at any place [be] unloaded, destroyed or rendered harmless, as the circumstances may require, without compensation, and the Merchant shall be liable for all loss, damage, delay or expenses arising out of their being taken in charge, on their carriage, or of any services incidental thereto.
> (3) If any Goods shipped with the knowledge of the Carrier as to their dangerous nature shall become a danger to vessel, vehicle or cargo, they may in like manner be unloaded or landed at any place or destroyed or rendered innocuous by the Carrier, without liability on the part of the Carrier, except to General Average, if any.

(See Affidavit of Eugene J. O'Connor in Opposition to ESM Group Inc.'s Motion for Summary Judgment [dkt. no. 96 (4261 action)] ("O'Connor Aff.") Ex. 15 (emphasis added).)

Section 6 of the Pudong Bill of Lading thus purports to

13

allocate certain obligations and rights between "Merchants" and the "Carrier." The Rickmers Interests seek to enforce against ESM Group the Merchant's obligation to warn and indemnify the carrier for damage arising from the shipment of dangerous goods. However, those obligations are not typically enforced against cargo purchasers, and COGSA certainly does not call for them.

The Rickmers Interests contend that under the Pudong Bill of Lading's expansive definition of "Merchan"--"the shipper, the Consignor, the Holder of this Bill of Lading, the Receiver and the Owner of the Goods"--ESM Group is exposed to liability (Id.) This so-called "Merchant Clause" establishes a liability regime foreign to the regime prescribed by COGSA because COGSA speaks primarily in terms of shipper liability. (See Opinion at 33-35.) As to shippers, the obligation to warn carriers of the existence and nature of dangerous goods and, if such warning are not provided, indemnify the carrier for loss or damage arising therefrom is set forth in COGSA § 4(6). That section states,

> "Goods of an inflammable, explosive, or dangerous nature to the shipment whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place or destroyed or rendered innocuous by the carrier without compensation, and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the

14

>       ship or cargo, they may in like manner be landed at
>       any place, or destroyed or rendered innocuous by the
>       carrier without liability on the part of the carrier
>       except to general average, if any."

COGSA § 4(6) (emphasis added).

COGSA does not extend such obligations to <u>purchasers</u> and <u>consignees</u>. (<u>See</u> Opinion at 22-29.) And, as the Court has already determined, COGSA's use of shipper cannot and should not be equated with traditional notions of purchaser and consignee. (<u>Id.</u>) The Pudong Bill of Lading's attempt to do so through its all-encompassing Merchant clause is thus foreign to the liability regime prescribed by COGSA and cannot be squared with <u>Stolt</u>. Purchasers and consignees are surely not on notice that when they purchase or receive dangerous goods, they shall be expected to warn and possibly even indemnify the carriers who ship them. Such a rule is inconsistent with the COGSA liability scheme.[8]

---

[8] Furthermore, I reject the Rickmers Interests' argument that ESM Group's failure to object to the Merchant Clause when receiving prior shipments of SS-89 evidences ESM Group's acceptance and agreement to be bound by it. The Rickmers Interests cite no cases where a purchaser's silence was found to constitute acceptance of a bill of lading provision. Indeed, silence as acceptance is a particularly strange theory of liability in this case because no payments or exchanges were made directly between ESM Group and the Rickmers Interests. <u>See</u> <u>Williston on Contracts</u> § 6:49 (4th ed. 2009) (describing at least one of the requirements for finding silence as acceptance to be the exchange of consideration).

Of course, carriers may contract with purchasers and consignees to impose obligations and greater liability than what the purchasers would otherwise have been exposed to. Or carriers may seek proof or assurances from shippers that they are acting as agents on behalf of their purchasers and consignees. In such cases, rules of contract formation and interpretation shall govern whether obligations imposed by bills of lading or supplemental contracts are valid and enforceable.

Most importantly, I find no authority supporting the Rickmers Interests' contention that a carrier may unilaterally impose on non-contracting purchasers and consignees obligations to warn and indemnify.[9] The Rickmers Interests' improperly assume that because of the unique facts involved in these actions--where a purchaser had a close corporate relationship with its shipper--the Court may conclude as a matter of law that the shipper and the purchaser were one-and-the-same entity and thus, had the same obligations. As the Opinion explains, a proper application of corporate control doctrines requires

---

[9] The analysis in cases such as Thyssen, Inc. v. M/V Markos N, 97 Civ. 6181 (MBM), 1999 WL 619634, at * 6 (S.D.N.Y. Aug. 16, 1999), and Midland Tar Distillers, Inc. v. M/T Lotos, 362 F. Supp. 1311, 1314 (S.D.N.Y. 1973), are not particularly persuasive considering the circumstances of these actions.

16

fuller treatment and ultimately a determination of liability by the fact finder. (Opinion at 39-40, 42-43.)[10]

Nor do these actions warrant the formulation of novel bill of lading interpretation rules. The Rickmers Interests' suggestions that "negotiable bills of lading" are sui generis and that holders of such bills of lading somehow become liable for all the obligations contained in them are unsupportable. While it is true that bills of lading essentially serve a dual role in the maritime context--evidencing a contract of carriage for the transportation of cargo and serving as a receipt or document of title for the cargo--the Rickmers Interests cite no precedent standing for the proposition that a mere holder of a bill of lading automatically accepts all the terms included therein.

Finally, I reject the Rickmers Interests' argument that ESM Group accepted the terms of the Pudong Bill of Lading by referencing it in a cross-claim asserted against Pudong. (See Counterclaims and Cross-Claims of ESM Group Inc. [dkt. no. 24

---

[10] I reject the Rickmers Interests' invitation to assume that ESMT acted as ESM Group's agent. Cases making such assumptions, upon which the Rickmers Interests now rely, are unhelpful at this stage. See, e.g., Jockey Intern., Inc. v. M/V "LEVERKUSEN EXPRESS", 217 F. Supp. 2d 447, 457 (S.D.N.Y. 2002) (basing its conclusion to bind a non-signatory to a bill of lading forum selection clause on an assumed agency relationship). Of course, I do not doubt that in many cases an agency analysis can be quickly disposed of. In these actions however, it cannot.

17

(4261 action)] ¶¶ 50-54.)  It is significant that ESM Group's cross-claim is asserted against Pudong, not the Rickmers Interests.  The claim states,

> At all pertinent times, Pudong was the contractually-responsible carrier of the Goods and owed ESM Group, as holder of its bill of lading, the duties imposed by that bill of lading and the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. ("COGSA"), to ensure that Rickmers Genoa was seaworthy, properly manned, equipped and supplied and that the holds and all other parts of the ship where the Goods were to be carried were fit and safe for their reception, carriage and preservation, and to carefully load, handle, stow, carry, keep, care for and discharge the Goods safely.

I do not consider this cross-claim to be an admission that ESM Group was a party to the Pudong Bill of Lading.  Rather, the reference to the Pudong Bill of Lading in the cross-claim is apparently meant only to preserve ESM Group's right to recover against one of the parties in the chain of transmission of the shipment of SS-89.  Understandably, ESM Group sought to preserve its rights, if any, under the liability regime prescribed by COGSA.  And rights under COGSA necessarily depend on the existence of some contractual relationship, usually evidenced by a bill of lading.  Thus, because ESM Group's cross-claim appears to be rooted in COGSA (statutory) rights rather than contractual rights, it can hardly be described as one where a party sought to assert rights conferred by a contract without accepting obligations imposed by the same contract. See Thyssen, 1999 WL 619634, at * 6 (concluding that bill of lading terms were

18

"binding upon the persons seeking to assert rights under the contract" once sued on).

For these reasons, the Rickmers Interests' Motion for Reconsideration is denied. All other arguments not addressed herein are denied as improperly raised on a motion for reconsideration.

## IV. Conclusion

For the reasons set forth herein, ESM Group's Motion for Reconsideration [dkt. no. 126 (4261 action)] is GRANTED, for the sole purpose of providing a more complete choice of law analysis. The Rickmers Interests' Motion for Reconsideration [dkt. no. 128 (4261 action)] is DENIED. Upon reconsideration, the Court adheres to the conclusions set out in the Opinion.

The parties shall confer and inform the Court by letter no later than August 14, 2009 as to how they intend to proceed.

DATED:   New York, New York
         August 6, 2009

*Loretta A. Preska*

LORETTA A. PRESKA, U.S.D.J.